UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:23-CV-00079-GNS

SCOTT HAMM                                                          PLAINTIFF

v.

DEPUTY RONNIE GOLDEN et al.                                      DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Leave to File Excess Pages (DN 36), Defendants' Motion for Summary Judgment (DN 37), and Defendants' Motion to Exclude (DN 38). The motions are ripe for decision.

## I.    SUMMARY OF THE FACTS

Close to midnight on August 21, 2022, Plaintiff Scott Hamm ("Hamm") walked out to his porch at his home in Russell County, Kentucky to investigate loud noises from an area nearby. (Compl. ¶ 1, DN 1; Hamm Dep. 12:3-13:6, May 3, 2024, DN 37-4). Across the road from Hamm's home is a lot containing the "Burdette building", consisting of two levels with the upper level connected to the lower level by a small ramp adjacent to the road. (*See* Defs.' Mem. Supp. Mot. Summ. J. Ex. H, at 20:00-21:03, DN 37-2 [hereinafter JPD Bodycam]). Hamm joined his girlfriend, Hila Flatt ("Flatt"), and noticed several officers congregated together and loudly talking near the Burdette building. (Hamm Dep. 12:3-13:6). These included Officer Elliot Smith ("Smith") of the Jamestown Police Department ("JPD"), and Deputies Jared Pierce and Defendant Ronnie Golden ("Golden") of the Russell County Sheriff's Department ("RCSD"). (Golden Dep. 9:16-24, 11:23-12:3, May 3, 2024, DN 37-3). Golden was a deputy supervised by Defendant

1

Derek Polston ("Polston") in his capacity as the Sheriff of RCSD (collectively, "Defendants"). (Polston Dep. 7:15-9:3, May 3, 2024, DN 37-7).  Smith had received a call about a suspicious person looking in vehicles in the parking lot near Hamm's property, and he and the other officers were responding to the call.  (Golden Dep. 9:21-24).  The officers positioned themselves on the ramp of the Burdette building because it provided a higher vantage point for searching the area, although they were unable to locate anyone.  (Golden Dep. 10:10-11:2).  The officers remained on the ramp after their initial search, "talking about [their] daily lives."[1]  (Golden Dep. 10:10-24).

Hamm yelled to the officers that he was watching the property for another person and told them to leave because it was private property.  (Hamm Dep. 15:3-9, 15:16-16:12).  Hamm, Flatt, and Hamm's neighbor, Elvis Bray, all testified that Golden's reply was that because he was police, he was able to go anywhere.  (Hamm Dep. 104:7-14; *see also* Flatt Dep. 13:16-14:10, May 3, 2024, DN 37-5; Bray Dep. 13:19-14:21, May 3, 2024, DN 37-6).  Golden testified Hamm told them they were trespassing, and the officers identified themselves as part of the sheriff's office in response. (*See* Golden Dep. 13:23-16:25).

Golden moved his car to the street and walked closer to speak with Hamm.  (Hamm Dep. 104:7-107:14; Golden Dep. 16:14-25).  As he approached, Golden smelled alcohol on Hamm's breath.  (Hamm Dep. 15:16-16:24).  Hamm estimated that he drank approximately three or four beers while at home during the course of the evening.  (Hamm Dep. 13:11-18).  Golden told Hamm to go inside before he arrested him for disorderly conduct and public intoxication because he was in a "very clearly intoxicated state" and "yelling in a public place causing a public annoyance or

---

[1] When asked about why they were sitting there, Jeff Kerns ("Kerns"), Police Chief of the JPD, stated he thought Golden and the other officers were talking after the initial call when they were unable to find a person matching the description.  (JPD Bodycam, 15:00-15:30).

alarm." (Golden Dep. 45:10-22, 46:18-24). Golden then handcuffed Hamm. (Hamm Dep. 18:2-21:11).

Hamm recounted that both he and Flatt told Golden about his inability to put his right arm behind his back because of his injured shoulder, and Golden replied he would "take [the right arm]" for him. (Hamm Dep. 19:9-20:3, 25:4-14). Hamm states he was put in the back of Golden's police car where he "could not get any comfort or ease or anything, [and] was not restrained other than the handcuffs, no seat belt, and that yapping [police] dog that was in the back." (Hamm Dep. 20:13-25). Hamm complained to Golden that the handcuffs were too tight. (Hamm Dep. 44:22-43:4). When he got to the jail, Hamm told a deputy jailer that his arm and shoulder were going numb and causing a burning sensation. (Hamm Dep. 45:7-47:8). Hamm also experienced pain while being taken to the detention center due to not wearing a seat belt and Golden driving at a high speed and being jostled around in the back seat. (Hamm Dep. 33:6-34:19).

Golden's version of the arrest is markedly different. He described handcuffing Hamm:

He placed his hands clasped behind—he clasped his hands behind his back. ·I used that opportunity to place his right hand into the right side of the handcuffs. And then once I told him to let go of his hands, I was holding onto his left hand to maintain positive control. Once he let go of his hands is when he jerked his left arm from behind his back.

(Golden Dep. 43:14-21). Golden contended Hamm was resisting arrest when he yanked his arm away from Golden. "At some point during the arrest[,] he had tensed his left arm and was clasping his hand and I was trying to get his hand free. That is when I consider him resisting." (Golden Dep. 27:8-16). Golden conceded that Hamm's arm jerk may have been "a natural tendency." (*See* Golden Dep. 45:14-18). "It's very uncomfortable [to be placed in handcuffs]. Through my training and experience, I've been handcuffed numerous times in the academy. It's a natural reaction to jerk your arm when that is happening." (Golden Dep. 45:14-18). Golden asserted

Hamm first informed him of his injured shoulder only when placed inside the police vehicle after already having been handcuffed. (Golden Dep. 28:10-25). Golden did not seatbelt Hamm because, while doing so, an individual could "potentially bite [him] in [his] neck or ear or face", and he thought Hamm was potentially dangerous. (Golden Dep. 29:4-12).

There is no bodycam footage of the arrest because Golden did not have his bodycam activated at the time of the encounter. Flatt took a video of the incident on her phone shortly after the arrest, but it does not record the initial encounter between Hamm and Golden nor Hamm's arrest. (Flatt Dep. 9:16-24). The video is dark but a brief conversation is audible between Flatt and Golden after Hamm is in the vehicle. (*See generally* Defs.' Mem. Supp. Mot. Summ. J. Ex. E, DN 37-2).

Polston and Kerns visited Hamm to speak with him about the incident the next morning. (Hamm Dep. 90:19-91:21, 93:19-94:7; JPD Bodycam, 15:00-15:30). Hamm asked if there was a video of the incident and was told that Golden did not activate his bodycam. (JPD Bodycam, 7:00-7:25). Hamm responded that he thought it was the department's policy to have the camera on, and Polston replied, "It's technically not been approved, but he didn't activate it." (JPD Bodycam, 7:00-7:25).

Hamm had cuts and scars on his wrists from the handcuffs. (*See* Hamm Dep. 50:10-50:21, 59:9-17, 63:15-63:21, 72:10-73:4). Photos show a dark bruise on Hamm's upper arm near the shoulder and cuts on his wrists. (*See* Compl. Ex., at 1-3, DN 1-1). Hamm's physician examined his shoulder two months later and informed him he would require physical therapy and surgery, which was performed in December 2022. (Hamm Dep. 49:5-53:10).

Hamm filed this action alleging Golden used excessive force, causing Hamm's injuries and violating his constitutional rights. (Compl. ¶¶ 8-15). Hamm has asserted federal and state law

claims against Polston and Golden in their official and individual capacities.  (Compl. ¶¶ 8-15).

Hamm's causes of action include federal claims under 42 U.S.C. § 1983 for violation of his Fourth

and Fourteenth Amendment rights, a federal negligent hiring and retention claim against Polston,

as well as state law claims for battery, assault, wrongful arrest, malicious prosecution, and

negligent hiring, retention, supervision, and training.  (Compl. ¶¶ 8-15).[2]

Defendants have moved for summary judgment on Hamm's claims against them.  (Defs.'

Mot. Summ. J., DN 37).  Defendants request leave of this Court to exceed the page limitation

under LR 7.1 and move to exclude evidence and expert reports of Hamm's physical injuries.

(Defs.' Mot. Leave, DN 36; Defs.' Mot. Exclude, DN 38).

## II.    JURISDICTION

The Court exercises subject-matter jurisdiction over this matter based upon federal

question jurisdiction.  *See* 28 U.S.C. § 1331.  Jurisdiction exists over the state law claims through

supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

## III.    DISCUSSION

### A.    Motion for Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of demonstrating the absence of a

genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If this lack of

material fact is established, the burden then shifts to the nonmoving party to present specific facts

indicating a genuine issue of a disputed material fact essential to the case, beyond "some

---

[2] The Complaint contains references to assault, battery, and trespass, but these are not listed as "claims" in the Complaint.  This Court will address these state law claims.

metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Specifically, the nonmoving party must present facts demonstrating that a material factual dispute must be presented to "a jury or judge to resolve the parties' differing versions of the truth at trial[;]" the evidence, however, "is not required to be resolved conclusively in favor of the party asserting its existence . . . ." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). In deciding whether to grant summary judgment, a court must view all of the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. If the record, taken as a whole, could not support a finding of fact in favor of the nonmoving party, the motion should be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

## 1. *Section 1983 Claims*

### a. **Qualified Immunity**

The Sixth Circuit has instructed courts that summary judgment is the correct stage of the litigation to evaluate a qualified immunity defense. *See Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) ("[I]t is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." (alteration in original) (internal quotation marks omitted) (internal citation omitted) (citation omitted)).

The Sixth Circuit has explained that qualified immunity protects "government officials from civil liability" when their actions do not violate a clearly established constitutional or statutory right that a reasonable person would have known when acting in the course of their

professional duties.  *See Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (citation omitted).  As the Sixth Circuit has explained:

> The qualified immunity analysis is a two-step inquiry:  (1) whether a constitutional right has been violated; and (2) whether that right was clearly established, though the steps need not be taken in that order.  The clearly established step asks whether existing precedent placed the conclusion that the defendant violated the constitution under the circumstances beyond debate.

*Id.* (internal quotation marks omitted) (internal citation omitted) (citation omitted).  A defendant must first provide facts indicating his or her actions were within his or her discretionary authority.  *See Hartman v. Thompson*, No. 3:16-CV-00114-GNS-DW, 2018 WL 793440, at *7 (W.D. Ky. Feb. 7, 2018) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)).  When this defense is raised, a plaintiff then has the burden of showing a defendant is not entitled to qualified immunity.  *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citation omitted).

Hamm has asserted claims against Polston and Golden, alleging liability based on their respective actions.  (Compl. ¶¶ 2-3).  Section 1983 creates a mechanism for a remedy when there is a deprivation of a constitutional right or an otherwise established right, but it grants no substantive rights.  *See Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001).  Each defendant's liability must be evaluated individually when there are multiple defendants.  *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015) (citation omitted).  "[A] plaintiff must prove that the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force in order to hold an office liable for excessive force."  *Id.* (internal quotation marks omitted) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)).

Golden concedes that he was the officer who arrested, placed handcuffs upon, and transported Hamm, giving rise to this case.  (*See* Hamm Dep. 18:2-21:11; Golden Dep. 43:14-21,

45:10-22, 46:18-24). Hamm, however, fails to provide evidence that Polston was on the scene and engaged in any conduct that would give rise to liability under Section 1983 for his actions. (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 13, DN 44). Polston was not on scene at the time of the arrest and only received a call informing him of the arrest from Golden after it was completed. (Polston Dep. 9:14-20). Accordingly, Polston is entitled to summary judgment on the Section 1983 claims, and the analysis below only addresses Golden's role in Hamm's arrest.

### i.    Constitutional Violation

The qualified immunity analysis begins by identifying which constitutional rights have been violated. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) (citations omitted). Hamm's Section 1983 claim against Golden invokes the Fourteenth Amendment and Fourth Amendment.[3] (Defs.' Mem. Supp. Mot. Summ. J. 14-17; Pl.'s Resp. Defs.' Mot. Summ. J. 8-10).

Hamm's Fourteenth Amendment arguments under Equal Protection and substantive due process fail on the facts and evidence presented.[4] Hamm has not provided any evidence that he belongs to a protected class or suffered disparate treatment because of any personal characteristics related to a protected class or others situated similarly to him. *See Jones v. Union Cnty.*, 296 F.3d 417, 426 (6th Cir. 2002) (citing *Boger v. Wayne Cnty.*, 950 F.2d 316, 325 (6th Cir. 1991)). Defendants' motion for summary judgment as to Hamm's Fourteenth Amendment claims must be granted.

---

[3] It is unclear whether Hamm is seeking a claim of substantive due process or procedural due process. Based on his arguments about state remedies, it appears that he is arguing under procedural due process, and this Court treats his argument as such, given Defendants' motion and Hamm's response. Hamm has alleged no facts that would sustain a substantive due process claim.

[4] In the Complaint, Hamm cites the Fourteenth Amendment broadly, but does not specifically mention Equal Rights Protection or substantive due process, though the two are housed in the Fourteenth Amendment. *See* U.S. Const. amend. XIV.)

Hamm has also failed to meet his burden regarding his Fourth Amendment Due Process right; additionally, this argument was raised at an inappropriate time. "[A] [p]laintiff may not seek relief under Section 1983 without first pleading and proving the inadequacy of state or administrative processes and remedies to redress [his] due process violations." *Jefferson v. Jefferson Cnty. Pub. Sch. Sys.*, 360 F.3d 583, 588 (6th Cir. 2004) (citing *Parratt v. Taylor*, 451 U.S. 527 (1981)). Hamm raises the inadequacy of state law remedies for the first time in responding to Defendants' summary judgment motion. (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 9). A plaintiff may only amend his complaint through a Fed. Civ. R. 15(a) motion; the Sixth Circuit has held these new allegations may not be raised in subsequent pleadings. *See Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483-84 (6th Cir. 2020) (quoting *Harrell v. United States*, 13 F.3d 232, 236 (7th Cir. 1993)); *see also Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 322 (6th Cir. 2017); *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014). Defendants' motion for summary judgment as to Hamm's Fourth Amendment Due Process claims is granted.

Hamm's remaining Section 1983 claims rests on wrongful arrest and excessive force, both rights implicated under the Fourth Amendment. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. For wrongful arrest, "[a]n arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011) (citation omitted). As the Sixth Circuit has stated:

> In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause. A police officer has probable cause if there

is a fair probability that the individual to be arrested has either committed or intends to commit a crime. A police officer determines the existence of probable cause by examining the facts and circumstances within his knowledge that are sufficient to inform a prudent person, or one of reasonable caution, that the suspect has committed, is committing, or is about to commit an offense.

*Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (internal quotation marks omitted) (internal citations omitted) (citation omitted).

In this case, Hamm stipulated to probable cause, as specified in the order dismissing the state criminal action. (*See* Agreed Order 1, DN 37-9). While Hamm alleged there was no probable cause in the Complaint, his response asserts for the first time that he was coerced into signing the Agreed Order. (*See* Compl. ¶ 9; Agreed Order 1; Pl.'s Resp. Defs.' Mot. Dismiss 7). A plaintiff cannot "amend [his] complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint." [5] *Bates*, 958 F.3d at 483-84 (citation omitted). "A stipulation of probable cause in an underlying criminal proceeding bars subsequent claims for unlawful search, false arrest, false imprisonment, and malicious prosecution." *Shemwell v. Heller*, No. 3:10-CV-336-CRS, 2012 WL 1038114, at *3 (W.D. Ky. Mar. 27, 2012) (citations omitted); *see also Trimbur v. Ky. Lottery Corp.*, 64 F. App'x 970, 974 (6th Cir. 2003) (holding a criminal defendant who stipulates probable cause for state law criminal charges may not raise subsequent claims for false arrest, false imprisonment, and malicious prosecution); *Pennington v. Dollar Tree Stores, Inc.*, 28 F. App'x 482, 488-89 (6th Cir. 2002) (stipulation of probable cause bars state torts claims); *see also, e.g.*, *Grise v. Allen*, 714 F. App'x 489, 495-96 (6th Cir. 2017).

---

[5] Another federal Kentucky court addressed an instance, similar to Hamm's case, that involved a plaintiff who stipulated to probable cause. In *Gover v. Muravchick*, No. 5:17-CV-272-REW, 2018 WL 4518580 (E.D. Ky. Sept. 20, 2018), a sister court analyzed a probable cause stipulation but found that the scope of the stipulation only related the probable cause for the traffic stop. *See id.* at *6 n.8. Hamm has not argued or provided any evidence that he only stipulated to probable cause for a portion of the state charges.

Hamm's only remaining Section 1983 claim is for excessive force. The Fourth Amendment safeguards an individual's right to be free from excessive force during an arrest or stop. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The U.S. Supreme Court clarified a Fourth Amendment seizure occurs when "when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97 (1989).

Courts utilize the "objective reasonableness" standard to evaluate an excessive force claim. *See Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009) (citing *Graham*, 490 U.S. at 396). It utilizes factors of "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citation omitted).

When examining these factors, a court must determine whether "the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)). This analysis ultimately balances "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citation omitted).

The first and second factors—the severity of the crime and the suspect's posed threat level—favor Hamm. For the first factor, the Sixth Circuit advises courts to see whether an offense is a misdemeanor or felony, whether the individual was suspected of being involved in an underlying felony or an officer was responding to an emergency call, and whether the suspect's conduct implicates public safety concerns to ascertain severity. *See Shumate v. City of Adrian*, 44

F.4th 427, 441-42 (6th Cir. 2022). Crimes like domestic violence and assault on a police officer with a firearm have been recognized as severe crimes while suspicion of an individual driving under the influence was not. *See Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 609-10 (6th Cir. 2020) (recognizing a complaint of domestic violence with "a potentially deadly assault" as a severe crime); *Kirk v. Calhoun Cnty.*, 2021 WL 2929736, at *6 (6th Cir. 2021) (recognizing assault of an officer with a firearm "a serious crime."); *contrast Eldridge v. City of Warren*, 533 F. App'x 529, 532 (6th Cir. 2013) (citations omitted) (recognizing an officer's stop of a diabetic driver experiencing a medical emergency while driving was not a severe crime). Disorderly conduct in the second degree and public intoxication are misdemeanors, which the Sixth Circuit has recognized are minor crimes where the plaintiff did not pose a threat to the officer or others. *See Scheffler v. Lee*, 752 F. App'x 239, 250 (6th Cir. 2018); KRS 222.202(1); KRS 525.060.

As to whether Hamm was a threat, it appears he was not under the totality of circumstances. Golden stated he did not seatbelt Hamm because he said an individual could "potentially bite me in my neck or ear or face" and thought Hamm was "potentially" dangerous. (Golden Dep. 45:10-22). Golden testified that Hamm appeared intoxicated to him—not that Hamm was armed or that he threatened or resisted him other than the arm jerk, which Hamm disputes. (*See* Hamm Dep. 19:9-20:3, 25:4-25:14; Golden Dep. 28:10-25, 45:14-18, 45:10-22). The first two *Graham* factors, therefore, favor Hamm under this analysis.

The third factor of whether there was resistance seems less clear in favoring either party, given the differing versions of the arrest. Whether Golden knew of Hamm's injured arm and whether his actions were active resistance are also contested. (*See* Hamm Dep. 19:9-20:3, 25:4-25:14; Golden Dep. 28:10-25, 45:14-18, 45:10-22); *see also Meirthew v. Amore*, 417 F. App'x 494, 498 (6th Cir. 2011) (holding an unarmed woman who refused to spread her feet for a search

while handcuffed was not a threat under the second *Graham* factor). Even if Hamm pulled his arm away, such minimal passive resistance would not have justified a substantial use of force. *See Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009); *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2008). Viewing these facts most favorably to Hamm, it cannot be determined that he did, in fact, resist arrest in the totality of circumstances. (*See* Hamm Dep. 19:9-20:3, 25:4-25:14; Golden Dep. 28:10-25, 45:14-18, 45:10-22); *see Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2006) (noting that "passive" resistance did not justify use of pepper spray, grabbing the suspect by the hair and wrist, and throwing her to the ground). "Once a plaintiff demonstrates a genuine issue of material fact as to whether there has been a constitutional violation, by making out a claim . . . sufficient to survive summary judgment, weighing the evidence and determining whether an officer should be liable are tasks exclusively for the jury." *Baynes v. Cleland*, 799 F.3d 600, 615 (6th Cir. 2015).

## ii.    Clearly Established

The second consideration for qualified immunity is whether the right was clearly established. Viewed in the light most favorable to Hamm, the circumstances of this case indicate this right is clearly established.

The Supreme Court has instructed courts to carefully articulate the clearly established right is at issue and avoid defining the right at "a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *see also Brosseau v. Haugen*, 543 U.S. 194, 200 (2004) (per curiam) (holding "a disturbed felon, set on avoiding capture through vehicular flight[] [that placed] persons in the immediate area . . . at risk" was the correct phrasing to articulate a clearly established right). Here the question is whether a reasonable officer would have known there was a violation of a clearly established constitutional right by using hinge handcuffs on an individual with a shoulder

injury known to the officer, where the individual complained of discomfort from the handcuffs. *See Dixon v. Donald,* 291 F. App'x 759, 762 (6th Cir. 2008) (providing an example of the articulated question on similar facts).

The Sixth Circuit has recognized that an individual's right to be protected from excessive force by law enforcement is a clearly established right, including "freedom from excessively forceful or unduly tight handcuffing is a clearly established right for purposes of qualified immunity." *Courtright v. City of Battle Creek*, 839 F.3d 513, 519 (6th Cir. 2016) (quoting *Baynes*, 799 F.3d at 613-14) (citations omitted); *see Martin v. Heideman*, 106 F.3d 1308, 1313 (6th Cir. 1997); *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001) ("This circuit has held that the right to be free from excessive force, including 'excessively forceful handcuffing,' is a clearly established right for purposes of the qualified immunity analysis." (citations omitted)). "As early as 1993, [the Sixth Circuit] held that it was clearly established law . . . that excessively forceful handcuffing violates the Fourth Amendment prohibition against excessive force." *Baynes*, 799 F.3d at 613 (citing *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993)). Whether an individual resists arrest is key in determining if a right has been violated. Active resistance can be "physically struggling with, threatening, or disobeying officers." *See Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012); *see Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010). Resistance can also be "refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (citing *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 96-97 (6th Cir. 2012)).

The Sixth Circuit has held that an individual who has told the arresting officer of a preexisting medical condition before being handcuffed had a clearly established right not to be

forcefully handcuffed in a way to exacerbate the condition. *See Courtright*, 839 F.3d at 516-19; *Dixon*, 291 F. App'x at 760-64. *Courtright* involved officers investigating allegations of a suspect threatening others with a gun and shooting a dog. *See Courtright*, 839 F.3d at 516-17. The officers arrested the plaintiff despite his denial of committing these acts. *See id*. The plaintiff was forcibly handcuffed behind his back despite warning officers initially he had prior rotator cuff injuries and shoulder surgeries that prevented him from putting his hands behind his back and repeatedly complaining of pain after being handcuffed. *Id*. In *Dixon*, police responded to a disturbance between neighbors; the plaintiff was a disabled veteran with prior torso injuries who was handcuffed by an officer after an accusation of assault. *Dixon*, 291 F. App'x at 760-61. The plaintiff asked to be handcuffed in front several times before the arresting officer dismissed the plaintiff's concerns and handcuffed him behind his back, resulting in a shoulder injury. *Id*. In both cases, the Sixth Circuit found that precedent clearly established the "right to be free from being handcuffed in a manner that causes unnecessary injury" after first pinpointing a constitutional violation during the qualified immunity analysis. *Courtright*, 839 F.3d at 518-20; *Dixon*, 291 F. App'x at 762-64. The Sixth Circuit held that the plaintiff had rebutted the qualified immunity defense under the dismissal standard in *Courtright* and the summary judgment stage in *Dixon*.[6] *Id.*

The Sixth Circuit has also recognized that a genuine factual dispute can preclude summary judgment on claims involving excessively tight handcuffing. *See Ouza v. City of Dearborn Heights*, 969 F.3d 265, 278 (6th Cir. 2020); *see also Hughey v. Easlick*, 3 F.4th 283, 289 (6th Cir. 2021). "In order to demonstrate a genuine factual dispute as to excessively tight handcuffing,

---

[6] Though *Courtright* addressed a motion to dismiss, the clearly established analysis was consistent with the summary judgment reasoning in *Dixon*. *See Courtright*, 839 F.3d at 520.

Plaintiff must put on some evidence that (1) [he] complained the handcuffs were too tight, (2) the defendant officers ignored [his] complaints, and (3) [he] experienced 'some physical injury' resulting from the handcuffing." *Ouza*, 969 F.3d at 278. (citations omitted). The Sixth Circuit has analyzed factual disputes in forceful handcuffing cases as "a subset of the general Fourth Amendment excessive-force framework." *Hughey*, 3 F.4th at 289 (quoting *Martin*, 106 F.3d at 131).

 *Dixon* and *Courtright* share parallels to this case. Hamm testified that he told Golden multiple times about his shoulder injury and the tight handcuffs. (Hamm Dep. 19:9-20:3, 20:13-25, 25:4-25:14). Golden testified that Hamm did not mention any shoulder injury until after he was cuffed and in the police car. (Golden Dep. 25:7-17). The key issue is whether Golden knew of Hamm's previous injury and his discomfort stemming from the handcuffs at the time of arrest or only after the fact. Golden does not dispute that Hamm suffered a physical injury, but his account differs from Hamm's regarding when he learned of the shoulder injury. (*See* Hamm Dep. 44:22-43:4, 45:7-47:8; Golden Dep. 42:23-43:3, 45:14-18). There are material facts remaining as to whether Hamm resisted arrest and whether Golden disregarded Hamm's reported shoulder injury when handcuffing him and placing him in the police car. (Golden Dep. 28:10-25, 45:14-18). In viewing this evidence in the light most favorable to the nonmoving party, Hamm has raised a material factual dispute as to whether Golden knew of Hamm's preexisting injury and discomfort and whether Golden disregarded this information.[7] (*See* Hamm Dep. 44:22-43:4, 45:7-47:8; Golden Dep. 42:23-43:3, 45:14-18).

---

[7] Golden had a bodycam which he did not activate. Footage from his bodycam could have been useful—if not determinative—in clarifying what took place. *See Est. of Marr ex rel. Marr v. City of Glasgow*, No. 1:21-CV-00050-GNS-HBB, 2025 WL 359325, at *2 (W.D. Ky. Jan. 31, 2025) ("If the video shows facts so clearly that a reasonable jury would be able to view these facts in only one way, the Court should view the facts in the light depicted by the video. When the facts

Hamm has established a clearly established violation of his Fourth Amendment right against excessive force, rebutting Golden's qualified immunity defense. This Court denies Golden's motion for summary judgment as to the excessive force claim.

### b.    *Monell* Liability

Polston and Golden contend they are entitled to summary judgment on the claims against them in their official capacities under Section 1983 for negligent hiring and retention because Hamm failed to prove or base his claim on a RCSD policy or custom to meet the requirements of *Monell* liability. (Defs.' Mem. Supp. Mot. Summ. J. 8-13). Hamm recognizes that his official capacity claims are ultimately against Russell County. (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 4-5).

Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), municipalities can be held liable for constitutional violations caused by an official policy. *Id.* at 690-91. A plaintiff bringing a *Monell* claim must show that: (1) his or her rights were violated; and (2) the municipality was responsible for the violation. *See Doe v. Claiborne Cnty. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 505-06 (6th Cir. 1996). Municipalities cannot be held liable for Section 1983 claims under the theory of *respondent superior*; instead, a plaintiff must argue "that the municipality's policy or custom caused the alleged injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Monell*, 436 U.S. at 690-91). A plaintiff can show an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official

---

shown in the bodycam footage can be interpreted in multiple ways or if the footage does not reveal the salient facts, the facts must be viewed in the light most favorable to the nonmoving party. Where the video footage has "gaps or uncertainties," factual uncertainties and any reasonable inferences must be viewed in the light most favorable to the nonmoving party." (internal citations omitted) (citation omitted)).

17

with final decision-making authority ratified illegal actions; (3) the existence of a "policy of inadequate training or supervision"; or (4) the existence of "a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted). A plaintiff must "demonstrate 'a direct causal link between the policy and the alleged constitutional violation . . . .'" *Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016) (quoting *Graham ex rel. Est. of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004)). As the Sixth Circuit has also noted, "[a] *Monell* claim that survives summary judgment is exceedingly rare . . . ." *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 542 (6th Cir. 2018).

Hamm relies on *Oklahoma City v Tuttle*, 471 U.S. 808 (1985), and asserts that *Monell* liability is based on "the existence of a policy of inadequate training or supervision." *See id.* at 823; (Pl.'s Resp. Defs.' Mot. Summ. J. 4-5). To prove an inadequate training claim, a plaintiff must demonstrate: "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [City's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury." *Brown*, 814 F.3d at 463 (alteration in original) (internal quotations omitted) (citation omitted). The level of training must arise to "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

Hamm's arguments are ultimately misguided and based on a misreading of *Tuttle*. In *Tuttle*, the U.S. Supreme Court held jury instructions incorrectly allowed a jury to infer a policy from a similar incident. *Tuttle*, 471 U.S. at 823-24. The Court held that proof of a single incident of unconstitutional activity is not sufficient to show an enduring policy absent proof of the municipality's fault and causation between the policy and constitutional violation. *Id*. Though offered as support, *Tuttle* undermines Hamm's position. He has failed to cite any RCSD policy or

custom, noting only "the hiring and employee retention policies of the Russell County Sheriff's Office," but offers Golden's actions in this instance as singular proof of an overarching policy. (*See* Compl. ¶¶ 9-10; Pl.'s Resp. Defs.' Mot. Summ. J. 5). The facts indicate that Golden potentially acted *contrary* to department policy. Polston and Kerns said Golden should have had his body camera activated during the arrest, but this has nothing to do with the amount of force applied to Hamm's handcuffs. (JPD Bodycam, 7:00-7:25). Hamm further bases Polston's knowledge of Golden's "violent tendencies" on two lawsuits that were dismissed and an Emergency Protective Order ("EPO") that was supposedly served on Golden but which has not been verified. (Hamm Dep. 87:20-88:19; Golden Dep. 36:1-23; *see also* Defs.' Mem. Supp. Mot. Summ. J. 11-13). These unsubstantiated prior instances of unspecified misconduct are clearly insufficient to prove that Polston knew or should have known of Golden's supposed predisposition to engage in unconstitutional conduct.

For these reasons, Defendants are granted summary judgment on Hamm's *Monell* claims.

### 2. *State Law Official Capacity Claims*

Hamm has also brought state law claims against Defendants in their official capacities. Kentucky law is clear on suits brought in a state officer's official capacity: sovereign immunity is an absolute bar to such claims. *See Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008) ("Sovereign immunity is a concept from common law 'that precludes the maintaining of any suit against the state unless the state has given its consent or otherwise waived its immunity.'" (quoting *Yanero v. Davis*, 65 S.W.3d 510, 517 (Ky. 2001))). The Kentucky Supreme Court has held that a sheriff, when acting in an official capacity, has absolute official immunity against all torts. *See id.* ("Thus, we conclude that absent a waiver thereof, a sheriff, as a county official, has absolute official immunity at common law for torts (by him or his deputies) when sued in his official capacity."

19

(quoting *Yanero*, 65 S.W.3d at 517)).  For Golden, individuals sued in their official capacities are "cloaked with the same immunity as the government or agency [they] represent."  *Schwindel v. Meade Cnty.*, 113 S.W.3d 159, 169 (Ky. 2003); *see also Autry v. W. Ky. Univ.*, 219 S.W.3d 713, 717 (Ky. 2007).  "A county government is cloaked with sovereign immunity."  *Schwindel*, 113 S.W.3d at 163.  Based on this precedent, Defendants' motion for summary judgment on state law claims against Golden and Polston in their official capacities is granted.

### 3.    *State Law Individual Capacity Claims*

#### a.    **Qualified Official Immunity**

Defendants contend they are entitled to qualified official immunity on the individual capacity claims asserted against them under state law because they acted in good faith.  (Defs.' Mem. Supp. Mot. Summ. J. 19-22).  Under Kentucky law, "[q]ualified immunity applies when public officials perform (1) discretionary acts, (2) in good faith, and (3) within their scope of authority."  *Nichols v. Bourbon Cnty. Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014) (citing *Yanero*, 65 S.W.3d at 522).  A discretionary act involves "the exercise of discretion and judgment" while a ministerial act is "one that requires only obedience to the orders of others . . . ." *Yanero*, 65 S.W.3d at 522 (internal citation omitted).

A plaintiff has the burden "to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith."  *Id.* at 523.  This good faith element has "both an objective and subjective aspect."  *Id.* (citation omitted).  The objective aspect considers whether there was a "violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position."  *Id.*  The subjective aspect analyzes whether "the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive."

*Id.* (citation omitted).  Because Hamm has conceded that Polston is entitled to summary judgment,[8] it is only necessary to address the state law claims against Golden.

### i.    Assault and Battery

Defendants seek summary judgment on Hamm's claims of assault and battery against Golden.  Under Kentucky law, "[a]ssault is a tort which merely requires the threat of unwanted touching of the victim, while battery requires an actual unwanted touching."  *Banks v. Fritsch*, 39 S.W.3d 474, 479-80 (Ky. App. 2001) (citation omitted).  Battery is "an assault whereby any force, however slight, is actually applied to the person of another, directly or indirectly."  *May v. Commonwealth*, 285 S.W.2d 160, 163 (Ky. 1955) (citation omitted).

"[A] police officer is privileged, under certain circumstances, to use force in effecting an arrest."  *Woosley v. City of Paris*, 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008).  Kentucky law grants protection to an officer "making an arrest [to] use such force as may be necessary to make the arrest but no more."  *Fultz v. Whittaker*, 261 F. Supp. 2d 767, 783 (W.D. Ky. 2003) (internal quotation marks omitted) (citation omitted); *Hanna v. Boyd Cnty. Det. Ctr.*, No. 20-136-DLB, 2023 WL 2309760, at *4 (E.D. Ky. Mar. 1, 2023) ("Kentucky law permits officers to use reasonably necessary force to make an arrest."  (citing KRS 503.090)).

Hamm has presented evidence of Golden's knowledge of his preexisting injury, which calls into question Golden's good faith defense under Kentucky's qualified immunity doctrine.  Under this doctrine:

---

[8] Hamm does not claim respondeat superior or vicarious liability as to Polston, and this Court will not address these arguments.  At the summary judgment stage, mere conclusory statements are insufficient to sustain such a claim.  *See First Nat'l Bank of Ariz.*, 391 U.S. at 288-89.  As noted earlier, Hamm did not allege that Polston was on scene at the time of the arrest, creating no factual issues.  As to the torts from conduct stemming from the physical arrest, Polston is entitled to summary judgment on the assault, battery, and trespass claims.

> Bad faith may be predicated on a violation of a "constitutional . . . or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position . . . or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive.

*Crigger v. McIntosh*, 254 F. Supp. 3d 891 (E.D. Ky. 2017) (quoting *Yanero*, 65 S.W.3d at 510). As discussed above, there are material factual disputes that raise the question of whether the level of force by Golden was appropriate. (*See* Hamm Dep. 19:9-20:3, 25:4-25:14; Golden Dep. 28:10-25, 45:14-18, 45:10-22). Defendants' motion seeks summary judgment on the claims of assault and battery against Golden is denied.

### ii.    Trespass

Golden also seeks summary judgment as to Hamm's trespass claim, arguing that even if there was a trespass, Hamm has failed to allege any injuries claim.[9] (Defs.' Mem. Supp. Mot. Summ. J. 29-30). "A trespasser is a person who enters or remains upon land in the possession of another without the possessor's consent." *Bradford v. Clifton*, 379 S.W.2d 249, 250 (Ky. 1964) (citation omitted). Kentucky courts have awarded damages even when there are vague or speculative values for trespass damages. *See Smith*, 226 S.W.3d at 55 (citations omitted). Thus, "'even if the plaintiff suffered no actual damages as a result of the trespass, the plaintiff is entitled to nominal damages.' However, in intentional trespass, in order to recover more than nominal

---

[9] Hamm alleges that Polston is liable for trespass under *Smith v. Carbide & Chemicals Corp.*, 226 S.W.3d 52, 54 (Ky. 2007). (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 23-24). This argument is wholly without merit. *Smith* addressed questions of whether actual harm is required for intentional trespass and whether a plaintiff proving diminution goes to recovery under law; the case is silent as to liability of an employer.

damages, a property owner must prove 'actual injury . . . .'" *Id.* (internal citation omitted) (citation omitted).

As Golden notes, Hamm's allegations are both threadbare and conclusory:

"Following the exchange the Defendant Golden, while acting under color of state law, trespassed on to the Plaintiff's property and physically assaulted him, handcuffed him and caused him injuries, as depicted in the attached photographs. The Defendant Golden, in taking these actions, did not have probable cause to arrest the Plaintiff and violated his constitutional rights under the Fourth and Fourteenth amendments to United States Constitution by assaulting the Plaintiff."

(Compl. ¶ 8; *see* Defs.' Reply Mot. Summ. J. 12-14). Hamm established no evidence of the required elements of a trespass claim nor that Golden failed to act in good faith; Hamm, instead, merely asserts that he was standing in his yard and then dragged into the street when he was handcuffed and arrested. (Hamm Dep. 18:2-19:25); *see First Nat'l Bank of Ariz.*, 391 U.S. at 288-89. "[I]t is well settled that 'a law enforcement officer is privileged to commit a trespass if he is exercising his lawful authority and if he exercises it in a reasonable manner, causing no unnecessary harm." *Hickey v. Hayse*, 188 F. Supp. 2d 722, 729 (W.D. Ky. 2001) (quoting *Downs v. United States*, 522 F.2d 990, 1003 (6th Cir. 1975)); *see also* Restatement (Second) of Torts § 265 (Am. L. Inst. 1965) ("One is privileged to commit an act which would otherwise be a trespass to a chattel or a conversion if he is acting in discharge of a duty or authority created by law to preserve the public safety, health, peace, or other public interest, and his act is reasonably necessary to the performance of his duty or the exercise of his authority."). As discussed below, the arrest was lawful, and there is an absence of evidence that Defendants caused unnecessary harm to Hamm's property while conducting the arrest. *See Curtis v. Hamby*, No. 5:12-CV-13, 2013 WL 5220017, at *5 (W.D. Ky. Sept. 16, 2013) ("Because Defendant exercised his lawful authority in a reasonable manner and caused no unnecessary harm, no cause of action exists for trespass, and any state law claim would be 'needless[].'" (alteration in original) (quoting

23

*Landefield v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993))).  Accordingly, Defendants' motion for summary judgment as to Golden's individual liability for the trespass claim is granted.

### iii.    Malicious Prosecution and Wrongful Arrest

Defendants request summary judgment on Hamm's claims of malicious prosecution and wrongful arrest.  (Defs.' Mem. Supp. Mot. Summ. J., 20-23).  The Sixth Circuit has interpreted Kentucky law to prohibiting the defense of "qualified official immunity for a claim of malicious prosecution."  *McNally v. Tabor*, No. 6:18-CV-16-REW-HAI, 2019 WL 6044882, at *16 (E.D. Ky. Nov. 15, 2019) (citing *Clemons v. Couch*, 768 F. App'x 432, 438-39 (6th Cir. 2019); *Martin v. O'Daniel*, 507 S.W.3d 1, 5-6 (Ky. 2016)).  To prevail on a claim for malicious prosecution, a plaintiff must prove:

> 1) the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff; 2) the defendant acted without probable cause; 3) the defendant acted with malice, which in the criminal context, means seeking to achieve a purpose other than brin[g]ing an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based; 4) the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and 5) the plaintiff suffered damages as a result of the proceeding.

*Johnson v. Smith*, No. 5:21-CV-00187-GNS-LLK, 2024 WL 1329925, at *11 (W.D. Ky. Mar. 27, 2024) (citing *Leath v. Webb*, 323 F. Supp. 3d 882, 896-97 (E.D. Ky. 2018).

Regarding Hamm's wrongful arrest claim, Kentucky courts do not differentiate between a false arrest and false imprisonment, and "a complainant must establish that he was detained and that the detention was unlawful."  *Wal-Mart Stores, Inc. v. Mitchell*, 877 S.W.2d 616, 617 (Ky. App. 1994); *see Lexington-Fayette Urb. Cnty. Gov't v. Middleton*, 555 S.W.2d 613, 619 (Ky. App. 1977).  A law enforcement officer cannot be held liable for false arrest if "he enjoys the privilege

to detain an individual," which may be obtained by establishing probable cause.  *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007) (citations omitted).

Defendants counter that Hamm's stipulation defeats his claim, and they are correct.  Hamm cannot satisfy all the elements to articulate a claim under wrongful arrest or malicious prosecution because of his stipulation of probable cause in the resolution of the state criminal charges.  (*See* Agreed Order 1, DN 37-9).  Defendants' motion for summary judgment as to Hamm's malicious prosecution and wrongful arrest claim is granted.

### iv.    Negligent Hiring and Retention

Defendants move for summary judgment on Hamm's negligent hiring claim, insisting that Hamm failed to show that Polston had knowledge of a risk in hiring Golden.  (Defs.' Mem. Supp. Mot. Summ. J. 23-26; Defs.' Reply Mot. Summ. J. 10-13, DN 45).

Claims for negligent hiring and retention require proof that the employer knew or should have known of the risk created by the employee.  *See Ritchie v. Turner*, 559 S.W.3d 822, 842 (Ky. 2018) ("[T]he plaintiff must prove (1) the employer knew or reasonably should have known that an employee was unfit for the job for which he was employed, and (2) the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff." (citation omitted)); *see also Grand Aerie Fraternal Ord. of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005). Supervision and training are discretionary functions.  *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 480 (Ky. 2006); *Doe v. Magoffin Cnty. Fiscal Ct.*, 174 F. App'x 962, 973 (6th Cir. 2006).

As indicated in the *Monell* liability discussion, Hamm has failed to provide proof of wrongdoing or lack of good faith.  The only support for Polston's notice of the risk created by Golden are two civil rights cases that were dismissed and an unverified EPO claim.  (Hamm Dep. 87:20-88:19; Golden Dep. 36:1-23; *see also* Defs.' Mem. Supp. Mot. Summ. J. 11-13).  This Court

grants summary judgment as to Hamm's negligent hiring and retention claim against Polston in his individual capacity.[10]

### C.   Motion for Leave to File Extra Pages

Defendants Golden and Polston request leave of Court to exceed the page limitation imposed by LR 7.1, citing a need to address and provide accounts of "numerous depositions and extensive written discovery and document production." (Defs.' Mot. Leave 1, DN 36). The motion is unopposed and therefore granted.

### D.   Motion to Exclude Evidence or Testimony

Defendants move to exclude evidence and expert reports regarding Hamm's physical injuries from his arrest because these were not previously disclosed by Hamm. (Defs.' Mot. Exclude Evid. 1-4, DN 38). Hamm argues that Defendants have notice from the discussion of the extent of his injuries during his deposition, and states he will not be utilizing a physician as a witness. (Pl.'s Resp. Defs.' Mot. Exclude 1-3, DN 43).

Under Fed. R. Evid. 403, Defendants must show that evidence of Hamm's physical injuries will cause unfair prejudice that substantially outweighs its probative value. *Id.* Defendants cite Fed. R. Evid. 702, which addresses the use of expert testimony, and *United States v. Ramer*, 883 F.3d 659, 680 (6th Cir. 2018). (Defs.' Mot. Exclude 2-3). Both are wholly irrelevant to the present motions because Hamm stated he is not using an expert.

---

[10] As a general matter, Defendants challenge the causation element for Section 1983 because Hamm did not disclose any expert opinions to show the arrest caused his injuries. (Defs.' Mem. Supp. Mot. Summ. J. 30-31). This is not required to state a claim under Section 1983. Defendants offer as support *Alberson v. Norris*, 458 F.3d 762 (8th Cir. 2006), but that is a far different case than these facts. While *Alberson* involved a prisoner with a "sophisticated medical condition," Hamm's condition consists of a physical injury to his arm, wrists, and shoulder. *See id.* at 764; (*see* Hamm Dep. 42:21-45:21, 50:10-57:1).

Defendants do not offer any authority to bar Hamm's testimony regarding his injuries, except the Eighth Circuit's decision in *Alberson v. Norris*. (Defs.' Mot. Exclude 1-4). The evidence of the physical injuries that Hamm wishes to offer is far less complex than that of *Alberson*, which involved a rare autoimmune disease. *See Alberson*, 458 F.3d at 764-65 (citations omitted). By contrast, Hamm intends to offer evidence of physical injury to his arm, wrists, and shoulder. (*See* Hamm Dep. 42:21-45:21, 50:10-57:1). "A plaintiff can recover compensatory damages in the context of a § 1983 excessive force claim only if he can prove proximate cause, or that an actual injury was caused by denial of his constitutional right." *Leath v. Webb*, No. 5:17-CV-38-JMH, 2018 WL 4440682, at *2 (E.D. Ky. Sept. 17, 2018) (citations omitted). A plaintiff can testify based on his rational perceptions of his injuries if the testimony is helpful to the jury in determining a fact at issue as long as the testimony is not expert testimony. *See* Fed. R. Evid. 701. In the absence of any affirmative authority to disqualify this evidence, Defendants' motion to exclude is denied.

## IV.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.    Defendants' Motion for Leave to File Excess Pages (DN 36) is **GRANTED**.

2.    Defendants' Motion for Summary Judgment (DN 37) is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's 42 U.S.C. § 1983 claims and state law claims against Polston in his official and individual capacity are **DISMISSED**. Plaintiff's 42 U.S.C. § 1983 claims and state law claims against Golden in his official capacity are **DISMISSED**. Plaintiff's due process, wrongful arrest, and equal protection claims under 42 U.S.C. § 1983 against Golden in his individual capacity are **DISMISSED**. Plaintiff's claims of malicious prosecution, wrongful arrest, and trespass under state law against Golden in his individual capacity are **DISMISSED**. Plaintiff's

remaining claims are his excessive force claim under 42 U.S.C. § 1983 and his assault and battery under state law against Golden in his individual capacity.  Defendants' Motion for Summary Judgment as to these claims is **DENIED**.

      3.      Defendants' Motion to Exclude (DN 38) is **DENIED.**

Greg N. Stivers, Chief Judge

United States District Court

March 4, 2025

cc:     counsel of record